Good morning. As you can see, Judge Hamilton is joining us live by video from South Carolina. And otherwise, we'll proceed just seamless. I don't think there should be any problems. We'll move forward. Mr. Watson, first case. Good morning, and may it please the Court, I'm Scott Watson. I'm here today on behalf of the FDIC as the receiver for the failed cooperative bank. And with the Court's permission, I'd like to reserve four minutes for rebuttal. Yes, so noted. Thank you, Your Honor. And if Judge Hamilton, if at any time I'm not clear in the microphone, please let me know. Thank you. Thank you. I hope to focus on three points today. The first is that North Carolina law provides that the standard of conduct and the standard of liability for directors and officers is liability for ordinary negligence. The second point is that North Carolina law does not require a showing of intentional misconduct in order to establish gross negligence. And that North Carolina law allows a plaintiff like the FDIC here to establish an absence of good faith without showing self-dealing or a conflict of interest. The DNOs, the directors and officer defendants here, urge this Court to apply the wrong standard in each case. Applying the correct standards, FDIC's evidence is sufficient to require a remand for trial. North Carolina General Statute 55-8-30 plainly establishes the standard of care for directors and officers and provides only one level of performance to escape liability. Directors have to discharge their duties in good faith and with the diligence, care, and skill of ordinarily prudent persons under similar circumstances. An ordinary care standard. It also provides that a director shall not be liable if he performed duties in compliance with the section. The director and officer defendants would effectively read out the second requirement. They argue only that the directors and officers must act in good faith. But rules of statutory construction forbid us from doing so, as do the decisions of the North Carolina Supreme Court, which urge this Court to apply the plain language of the statute. Can I just ask you a question about what you're calling the liability standard in the statute? So as I understand your counterpart's argument, it's that that liability standard, I mean, it's written in the negative, right? They're not liable if they perform their duties in compliance with the section. It doesn't say that they will be liable if they don't. And so they read this as just eliminating the prospect of strict liability. But that's all it does. So what's your response to that? I have two responses. One is a response applying rules of statutory construction. And the other is a response by turning to the common law in place at the time the statute was enacted. The common law provided for liability for acts of ordinary negligence by directors and officers. And we've provided a number of cases. That's a longstanding law in North Carolina. And in the Solomon v. Bates case that we've quoted in our briefs, the Court was clear, especially in the context of bankers, that liability will lie for ordinary negligence. As to principles of statutory construction, though, the first is a plain language construction if they comply with the statute. And the statute has two, and it's good faith and ordinary care. But if there were any doubt about what was intended, the legislature has made that clear. In applying the same standard for directors and officers of nonprofit corporations, for instance, they've nevertheless explicitly provided by statute that there will be no liability except for instances of gross negligence. And that language would be entirely superfluous in the other statutes if the standard of care provided in 55-8-30 didn't also impose liability. There would just be no need for a statute exculpating for any conduct except gross negligence unless the standard actually established liability for gross negligence. Let me ask you something. Yes, Your Honor. Are you arguing with respect to Issue 3 that the FDIC forecasts sufficient evidence that the defendant officers acted wantonly? In other words, are you arguing under the gross negligence standard that you don't have to show gross negligence, that you just have to show simple negligence? No, Your Honor. We're definitely not arguing that. We're arguing that our evidence establishes ordinary negligence. Our evidence also establishes gross negligence in this case, and our evidence demonstrates an absence of good faith. With respect to the officer defendants? Yes, Your Honor. The officer defendants in this case, we start from the premise that all of the parties involved as defendants in this case were aware of the substantial, detailed, pointed criticism of their loan practices in both underwriting, gathering information regarding verification, and in loan administration. All of them were aware of that. All of them were aware of the contents of the report of examination in 2006. All of the directors signed that. President Willits, who was in charge as officer as well as director, made repeated commitments to change the credit culture and to ensure that adequate administration occurred. And all of the directors and officers committed to implementing changes that were recommended by the examiners. So they began with knowledge of the weaknesses in their information gathering and reporting systems as far as lending. That promise that I referred to by the directors and officers is found in the record of examination itself. The examiners explained that they had had conversations with each of the directors who had represented that they were committed to implementing the changes of the criticisms, quote, throughout the report. So they began knowing that what they were doing was inadequate and failed to change their processes and instead allowed the officers to go ahead and continue those flawed processes. And it's our contention that that certainly is sufficient to remand for trial on ordinary negligence and gross negligence as well, because the defense to gross negligence, the legal defense that's offered by the directors and officers and that was adopted by the district court in this case, is that gross negligence requires an element of intentional misconduct. And we believe that the North Carolina Supreme Court has recently addressed that, has clarified what may have been confusing in the law, and has established that gross negligence does not require showing of intentional misconduct. As I read the law under North Carolina, it requires that the defendants acted wantonly. That is both as to the officer defendants and as to the director defendants. Now, where is your showing in the record that they acted wantonly? Our showing in the record that they acted wantonly is in multiple places. We believe that it's wanton to ignore the criticism of the regulators that you have promised to change that go to dangers in the lending process. They created undue risk. That's directly from the record of examination. To ignore undue risk in the processes that you have in administering the bank is wanton. But I would like to clarify that what the law in North Carolina is with regard to gross negligence is that willful misconduct certainly includes gross negligence. I'm quoting from the Jones decision. But gross negligence may be found even where a party's conduct does not rise to the level of deliberate or conscious action implied in the terms willful and wanton. So the distinction that's drawn by the North Carolina Supreme Court in the Jones decision is that conscious action is not to be implied in the terms willful and wanton. It doesn't require conscious action. Although a finding by a finder of fact that they had consciously disregarded the warnings and in the case of the lot loans had consciously disregarded reports to them that those loans violated the lending policy and were being done without verifying the income of the borrowers, that the directors continued to allow those loans to be made. The FDIC in this case, as to the directors, has only sued them on the lot loans for the lot loans that were made after it was reported to them that loans were being made on the stated income with no verification of income and that that was an exception to the bank's loan policy. Can I ask you a question about the reports and the criticisms in the reports that you're alluding to? So what do we make of the passing grades, the overall passing grades? I mean, they do seem somewhat, I totally understand the part you were talking about, the text of the reports, the criticisms, very pointed within the text, but the grades themselves are pretty good. So is that just grade inflation or am I supposed to wonder whether maybe the text isn't as bad as it sounds because it comes together with this passing grade? Respectfully, Your Honor, I think it's the opposite, that the criticism is as bad as it sounds, but that the grades recommend, as the report of examination explicitly said, that the criticism that was offered and giving a two was appropriate when the criticism that was offered was well within the capability and willingness of the bank to make those changes. And the directors who signed this report had committed in conversations to the examiners that they would make those changes. The analogy isn't perfect, but if the fire department were to inspect a restaurant and say, well, generally you have smoke detectors, but you're now engaged in a lot bigger cooking with a lot bigger flames, like the construction and commercial lending that was now being done by the bank, but you need to install new batteries in your smoke detectors, you need to move the gasoline away from the fire, you need to do all of these things, but having promised to do it and knowing that it's within your capability to do it, we're going to go ahead, as the fire department, and say it's all right, it's within your capacity to change it. But it isn't a binding statement, and certainly it shouldn't result in taking away from a finder of fact that these criticisms went directly to dangerous practices that caused undue risk in the lending function and that were very pointed about places where they didn't have loan policies, deviated from their loan policies, the need to record exceptions to loan policies and administer and follow and monitor those. All of those were criticisms that were made, but they are well within the power of the directors and officers to change. They just didn't change them. So I understand your response to Judge Harris's. The grade is this is how you're doing if you do these things that we say you need to do. That's correct, Your Honor. And a 2 was not given by the FDIC saying you're entitled to a 2 after ignoring our warnings. That simply isn't what occurred, and the loans at issue in this case had not been made at the time that that 2006 examination with the pointed warnings was made. I'd also like, if I can, to turn to the absence of good faith. It doesn't require a showing of self-dealing or conflict of interest. The Custard decision upon which the directors and officers rely extensively and which was relied on by the district court below explicitly says the question is whether they were acting in bad faith or with a conflict of interest or self-dealing, and the question is whether they acted in the best interest of the bank. Quote, paraphrasing I should say, it's not limited to conflicts of interests. There is a component of affirmative action. There may be circumstances where a director is required to act. And the cases that they cite for the proposition that self-dealing in North Carolina absolutely requires a, excuse me, bad faith requires a showing of self-dealing or conflict of interest simply don't say that. If you review the cases in their brief, they do go and cite to cases where the court found there was self-dealing and declined to apply the business judgment rule. But in those cases, that doesn't define the universe of what might be bad faith. It merely confirms what we know, and that's that bad faith includes self-serving or conflicts of interest. But it doesn't require it in North Carolina, and it doesn't require it even under the expansive business judgment rule that the directors and officers urge on the court. In Delaware as well as in North Carolina, it doesn't require a showing of a conflict of interest or self-dealing. It's sufficient if the directors knew they were making material decisions without adequate information or deliberation. That's taken from the Disney case in the Delaware courts. The Karamark court comes to a similar conclusion. In the Disney case, the directors failed to ask why they weren't informed, failed to inquire about terms and conditions, failed to delay and abstain from voting in order to gather more information. In that case, as we contend in this case, the directors and officers demonstrated a we don't care about the risks attitude, and a we don't care about the risks attitude is not entitled to the protections of the business judgment rule. So just so I understand kind of the structure of your argument. So you're arguing this is one way that you would say you would kind of get out from under the business judgment rule because you would argue there was evidence supporting bad faith. Is that your only argument for why the business judgment rule doesn't apply? What's your primary argument? My argument on the business judgment rule is that the business judgment rule reflected in the law of North Carolina cannot elevate the standard to one of gross negligence, which is what the district court did here. That would be inconsistent with the plain language of the statute and inconsistent with all of the decisions that were in place at the time. Also, the development of inferior North Carolina courts, the business court or the courts of appeals, of a more robust business judgment rule that contravenes the standard of care that's in the statute simply isn't allowed. The courts are forbidden from construing a business judgment rule that would contradict the plain language of the statute, and they don't point to a case prior to the statute with a business judgment rule remotely like this that would exculpate them for any conduct except for gross negligence. So what does the business judgment rule do in North Carolina? I guess that's what I'm getting at. So what does the business judgment rule protect? In the case of bank directors and officers particularly, where they are subject to well-understood industry standards for underwriting, industry standards for performance, laws regarding lending limits, their own loan policies that are announced to the world as to what's safe, in those cases they must exercise good faith in the process by which they go about their business. But subsequent questioning of the judgment of their decision, the kind of hindsight that is based strictly on the outcome of the decision is forbidden. There's a case out of the Fifth Circuit, FDIC v. Wheat, that has an instruction to the jury that we think helps inform what's intended by the modest business judgment rule reflected in the statute. And I should say that every court to interpret the statute, certainly the Eleventh Circuit and the other courts that we've cited in our briefs who have interpreted the statute, have interpreted it the way we urge. But that business judgment rule, you're instructed that a director or officer of a bank shall not be liable for claims against him if in the discharge of his duties he exercised ordinary care and acted in good faith and honestly exercised his best business judgment within the limits of his actual authority. A director or officer of a bank shall not be held liable for honest mistake of judgment if he acted with due care in good faith and in furtherance of a rational business purpose. That is the same standard that the Stahl decision and that courts as early as the 1940s in the New York case that we provided in our brief say. The business judgment rule does presuppose the exercise of due care, and mere errors in judgment with hindsight, honest mistakes in judgment, won't give rise to liability. Mr. Watson, I know your time is up. I just want to ask one question because I'm going to get into it with the Appalese Council. Did the Appalese ever, in response to the pointed suggestions of things need to be done, ever respond with counterarguments in terms of business judgment that what they're doing is correct or that what you say forecast might happen would not be a result of what they were doing? Did they ever raise any business judgment defense to anything? I don't believe that they do. They certainly don't in their brief here. And they rely on real-time response. I'm talking about when the reports were done, 06, 07. That's what we're doing with all these briefs. But the question about business judgment is when you give business judgment. And rather than raise – there were some where there were responses where President Willits did disagree with a specific criticism or statement of the examiners. That's in the examination report. And that goes to business judgment, doesn't it? But the directors and officers, as I said, committed to making the changes – committed to making changes to implement the criticisms or correct the criticisms found throughout the report. That's a direct – or I'm paraphrasing, but very closely, the language of that record of examination. And that was done in face-to-face meetings with those directors. All right. Thank you. Thank you. Mr. Gilbertson. Thank you and good morning, Your Honors. And may it please the Court, Tom Gilbertson on behalf of the dependent at Paliz. And I'd like to respond following the three issues that my colleague, the Receiver's Counsel, Mr. Watson, raised. But right out of the gate, I want to address the record below, the evidentiary record. Mr. Watson made reference to a 2006 bank exam that had pointed criticisms in it. And I believe if you look at the actual ROE, the report of exam, it calls them weaknesses about certain loan underwriting or credit administration practices at this bank that had been getting 2s and 1 camel ratings for years leading up to this 06 ROE. And he's correct, as happens after every bank exam, they come in, they often meet with the directors and the directors sign off on it and they agree to respond to some of the suggestions for improvement. And that happened here. The following year, the regulator was back in the bank and a thorough examination was made in late 2007. And part of that exam assessed how well these directors and officers responded to the weaknesses in loan underwriting and credit administration that had been identified in the 06 ROE. And that 07 exam found that while these DNOs were, quote, unquote, slow to correct a number of the identified deficiencies in the 06 ROE, quote, areas of improvement are noted. That's not gross negligence. The 2007 ROE said, and again I quote, that management is experienced and capable of managing the bank, however, and then laying out some areas for improvement. The 2007 ROE found, and again I'm quoting, board oversight. This goes to the director defendants. Board oversight of operating management is satisfactory. And this, although improved since the previous examination, overall loan administration still warrants attention. There's a spectrum, Your Honors, I would suggest, of banking practices. And at the highest level there's prudent banking. This is banking that has foresight, extreme caution. Maybe it's even inspired. It's a very high standard. It's the standard that the FDIC and other bank regulators promote in their visitation and supervisory capacity at banks. It's the standard that these examiners were promoting when they issued these 06 and 07 ROEs and gave the bank a B. That CAMELS II rating, the Receivers' Council wanted to share some thoughts about what it means. It has a regulatory defined meaning, and that meaning includes no material supervisory concerns. That's not something that you bargain for with the bank examiners. It means what it means per the CFR. Coming down the scale from prudent banking, we come to what I would suggest is good enough banking, like good enough parenting, right? It's good banking. I might give you a 2 for that. I might give you a 3. Let's come on down the scale quite a bit more, and I would suggest there's quite a bit of distance until we get to negligent banking. This is the kind of banking that meets the definition of negligence. There's foreseeable harm that is arising from what you're now doing. And then let's go even further down the spectrum to what's relevant here, grossly negligent banking that's wanton conduct, Judge Hamilton. And whether it is deliberate, I think we argue a lot about the words, but it involves a culpable mental state that's far and above and beyond inattention. It's not a matter of degree. It's not heaps of logs of negligence to build a negligence bonfire. It's the quality. I'm going to take this action, and I know the injury and harms that are going to result. There is no evidence of gross negligence in this case. There are statements like they ignored warnings, and the Receivers' Council in their advocacy make a lot of these statements, but the record won't support them. They're insupportable references from a non-movement on summary judgment trying to overcome presumptions of the business judgment rule that raise the bar. It's beyond just coming up with a jump-off situation. Hey, we're in equipoise. A jury could look at these series of disputes we're having about whether this was good enough banking, and what are they going to conclude? They can't conclude it's gross negligence, because in the real world, in real time, the bank examiners were in the bank. They saw these same practices that are challenged here in connection with these loans. They judged it a two, no material supervisory concerns. They made their criticisms. The 07 ROE says those criticisms were responded to in some part, large part, not completely. It's still not gross negligence. The statute and its interface with the business judgment rule. Can I just ask you just so I understand the structure of your argument? So, I mean, your argument depends on gross negligence being the standard. I mean, are you arguing that if simple negligence were the standard, there still wouldn't be a question for the jury? I don't think this non-movement came forward in response to our motion and under the applicable federal rule put specific facts before the trial court judge to show negligence. Really? Okay. It was all argument and the waving of a hand at a gigantic record. You don't think they pointed to things that you weren't doing that would inevitably lead to problems with the bank, particularly in a climate of falling commercial value, real estate value? You don't think they pointed to things that you need to do? No, Judge. You don't think they did at all? I don't, because we're in the same position that Chairman Bernanke and the highest economists of the land were at that same time. No one saw this cataclysm coming. This was no mere downturn. This was a cliff turn. No one saw that coming, Judge. You don't have to see it coming when someone tells you, who's a regulator, you need to do this. They didn't ask you to see what lies dimly ahead. They asked you to do what clearly was at hand. I understand, Judge, but there's still some latitude for judgment before we get to negligent banking. And when the regulator says, I'm going to give you two, there are no material supervisory concerns today, but I'd like to see you improve those credit administration and loan underwriting processes, and then the record shows my directors and officers going out and hiring a new CFO and new credit administrators and onboarding additional audit staff, bringing in independent auditors from credit risk management, and that independent auditor comes in and in the following year takes a look at my loan underwriting improvements and says, hey, these are upper quartile. Upper quartile is not negligent banking. I'm still not down that spectrum. Just help me out because, I mean, there's evidence in the record, right, that your directors were approving loans on the phone in very short conversations rather than in any kind of a deliberative way and that they were sometimes doing it with no documentation at all, and the FDIC has an expert that says that's a gross dereliction of duty, but you think that doesn't even rise to the level of negligence? I don't believe the record supports that characterization of what was happening. These directors and officers and the depositions I was sitting in, the directors testified that these calls often were preceded by documents that were faxed out. Often, but did anyone say they always had information in front of them when they made the phone calls? I don't believe anyone testified to that, Your Honor, but I will point out that the reliance statute in North Carolina that exists, and it's one of our alternative grounds for affirmance, but it's often cited, and I know the Ehrenhaus Court, for example, the North Carolina Court of Appeals that construed the business judgment rule, a robust business judgment rule in the same way we propose and in the same way it was proposed below. They cited this reliance statute. That statute provides that the presentation of the information on which the directors and officers are relying may be oral. So the fact that it's not always in paper form in someone's hot little hands while the decision is being made is not that dispositive. So many of the directors testified that the calls could last a half an hour or an hour. But some people said, or 10 minutes. One individual said that, and he hasn't been on the Board since like eight years when he testified to that. But this is an example of kind of the running disputes we have with them, and I don't think any of them add up to gross negligence. But we're talking about negligence now. We're talking about negligence. What about refreshing appraisals and shoring up collateral? The evidence shows that many appraisals were refreshed, but this was customary banking, and the FDIC has itself made recent statements about how community banks such as this operate, and they call it relationship lending. A bank like Cooperative Bank of Wilmington was in that community for over 100 years. They were serving a community in this very space in real estate lending, and oftentimes they were serving borrowers who wouldn't be served by larger national or regional lenders. And so the terms oftentimes, you know, they look more favorable to borrowers. Let me ask you this. As I understand it, the FDIC issued a report with respect to each loan it issued. Is that correct? No, Your Honor, they did not. They issued a bank exam each year after coming into the bank and examining it, and they would examine the large CRE loans. The testimony is the largest loans in the bank would get examined. But it's an interesting point of fact, Your Honor, that the loans they challenged in this case were never called out in any report of examination as requiring special attention or presenting special problems. I'm sorry. Didn't their expert testify that all of the commercial loans, I'm going to get this wrong, but I thought the expert affidavit said that I think it was all of the challenged business loans, the big loans, commercial loans, did have, they all had exceptions to the policy, but they weren't really discussed or justified. Am I remembering that wrong? Do you know what I'm talking about? I believe you're recalling correctly they're experts, and as we argued below, and I think the decision below correctly disregards that, because you can't come in with an expert lawyer, which is what Kelly is, and start offering opinions about the ultimate conclusion, legal conclusions in the case, which is exactly what he's doing in his opinion. And, you know, he was ushered out of his own bank, so that's something to dispute if this case goes back, but I don't think it still makes for a gross negligence issue in this case. Or negligence, though, because that's what we're talking about. Or negligence. But I do want to speak about the statute. Before you get to that, if I may, you brought up the issue about these experts. The FDIC had an expert named Mr. Kelly, and the other defendants brought up an expert by the name of Gammill, G-A-M-M-I-L-L. He was our expert, yes, Your Honor. All right. Now, they gave conflicting opinions, did they not? Raising genuine issues of material fact. The question is, how can we sustain the summary judgment in favor of the officer defendants with respect to those conflicting expert opinions? I think the quality and the substance of their opinions differs, because Mr. Gammill came in. He is a – I understand all that. Their opinions may be wrong. He's not a lawyer, Judge. But isn't that a question for a jury? Not if at the end of the day there's no material dispute of fact between them that's material. So it could be the case that based on the material facts in the record and what's a genuine dispute and what's not, one of the experts is correct and one isn't. But I don't think these experts were really trying to go head-to-head, Judge. I mean, our expert's not a lawyer. He's a banker. And he was talking about what's standard banking practice in the Southeast, because he's a banker in the Southeast with close to 40 years' experience. So that's what he was testifying about. Are these ordinary and customary practices of community banks throughout the Southeast? Was this economic crisis foreseeable? I'm sorry, I thought they did go head-to-head on that, because the FDIC's experts said that even in this community, your defendant's bank was an outlier, right, that they had much more risk exposure than other comparable banks in the community. So they did go head-to-head on that. I think that I understand Your Honor's reference, and I note that Mr. Kelly made reference to the fact, and it's been in some other materials from the FDIC, that the cooperative bank was in the 97th percentile on CRE concentrations, for example. That does not constitute gross negligence either, Judge, because – I'm just talking about now whether the experts are sort of head-to-head on certain very important facts. Courts will always be at odds with one another, and so it doesn't preclude summary judgment in every case when each side has an expert. I think it's probably the short answer to that. But I don't think they were trying to do the same thing. It's critical, though, for me to address the statute in its interplay with the business judgment rule, because the Receivers' Council just has the law wrong, and the North Carolina courts are appropriately construing this statute, which, as Your Honor, Judge Harris pointed out, it does not contain a clause that says a failure to abide by this standard of conduct will result in liability. Instead, it makes the statement that if you comply, you may not be found personally liable. We're talking about the personal liability of bank officers and directors. What this Court has always recognized is a great exception to the ordinary rule under our corporate form. And it's also not the case that other states don't have a similar statute and continue to honor a robust business judgment rule. Maryland and New Jersey, for example, and Alabama, both of them impose an ordinary negligent standard of conduct on officers and other directors, but the courts shield DNOs absent a showing of gross negligence. And one case, which is quite recent, a couple of months ago up in Maryland, makes this point. FDIC v. Arthur, 2015, WL898065 at Star 67. Also in New Jersey, a bit earlier, Fink case, 801A2, 295 at 306. The North Carolina legislature also adopted official comments with the Section 55830. And in North Carolina, these carry substantial weight. The official comment answers the question that's being posed here, and it says that the business judgment rule will continue to develop, and we're not here trying to codify the business judgment rule. We're not trying to rule it out. So this standard of conduct that we're now establishing will continue to apply, and if you've met it, you won't be liable. But where compliance with this standard is in doubt or in question, that's when the business judgment rule kicks in. And, Your Honors, it has to, or it has no meaning whatsoever. The business judgment rule, if it doesn't protect against a negligence claim, it protects against nothing except strict liability, which never existed in the first place. Corporate officers and directors, and not just bank corporate officers and directors, this case and this issue, this assault on the business judgment rule, affects all directors and officers in every corporation, large and small, in North Carolina. North Carolina appellate courts in the Ehrenhaus case, the highly respected business court of North Carolina in the Custard II case, are showing us how they will continue to respect the principles and apply the principles of a robust business judgment rule where gross negligence is the standard. Even while this statute, 55830, creates a standard of conduct that is more along the lines of ordinary negligence. Absent a showing of insider dealing, fraud, abuse, Mr. Watson said on his third point that the Custard I decision says, oh, well, it doesn't have to be a conflict of interest. We understand that. An absence of good faith could be shown, for example, by a bank director's knowingly processing payments for some Ponzi scheme. I mean, there's some additional unlawful conduct or very bad conduct that bank directors could affirmatively pursue where it's not necessarily in their self-interest. It doesn't give rise to a conflict of interest. It's not exactly their fraud. But, you know, we don't need to hypothecate about those situations because none of them are present here. The only allegations in this case is kind of what they call, you know, weaknesses in credit administration and loan underwriting, which in this cataclysmic financial collapse, this bank and many other community banks like it, judges, this bank was not too big to fail.  They were heavily invested in real estate in their communities, not elsewhere. And that's what community banks do, that we've relied on community banks to play that vital function for a century. And that's where their money was. So in this particular crisis where real estate and all the issues going on with mortgage-backed securities brought on this collapse, it's no wonder that it hit banks like this and banks in the coastal Carolinas the hardest. Can I ask you a question about the district court's opinion below? So I feel like we've talked a lot about kind of the full state of the record, but as I read the district court opinion, it relied extremely heavily, if not exclusively, on this idea that because the bank got the passing grades, the CAMEL grades, as a matter of law, it could not have been negligent slash grossly negligent. Negligent in any way that counts in this case. And it's as simple as that. If you get the passing grades, then you can't, the FDIC can't possibly make whatever showing it's required to make here. And I just have some concerns about that. I just feel that, and this is what I was asking the FDIC about, and I guess I'd like to get your response, too. I mean, just as a matter of common sense, we always sort of think the specific trumps the general, right? So there's this general grade, but what's specific about these reports, it's all about the weaknesses, the criticisms, the things that have to change. And so I guess I'm asking you the same question I asked the FDIC. How do I sort of put those two things together? I mean, how can I overlook all the specific things just because of this very general grade? And I see my time has elapsed. May I respond, Your Honor? Yes, you may. I would also be concerned if that were the case, but I think that I would invite Your Honor to revisit the trial court's opinion again because he cites not only the CAMELS II grade, but many of the things I mentioned at the outset, the 2007 ROE, the independent auditors who came in, the substantial improvements that had been made, the vast record, which is now piled on some of our tables, a piece of it anyway, that showed that the challenged commercial real estate loans were substantially documented. There was substantial due diligence that was conducted in the ordinary course by the bank. And the lot loan program, which the 2007 ROE notes, I mean, the examiners saw that and said, you know, I see how big it is. You seem to be managing it well. There's a much larger record, and the mere existence of a large record like this shows that this isn't going to be a situation of gross negligence because a gross negligence case involves an utter failure of systems. If this was gross negligence, there would be hardly any record at all. Your Honors, thank you. Thank you, Counselor. Mr. Watson, I want to ask you a question. I'm going to give you a little extra time because I'm going to be throwing you off in the bubble a little bit, but I want you to answer this question personally. It's sort of a linear geometry question. It's a question about spectrum. I think if you respond to this the way I'm going to construct this argument is I hear Mr. Gilperson explains it, that the North Carolina law gives sort of the first end of the spectrum, I would call it a safe house. If you comply with these things, you're not going to be liable. That's the first part of it. And the next would be, and I think here's where the rug is, then he would say then next if you don't do that, then you're entitled to your business judgment, as anybody would be, and that's assumed on the spectrum of negligence. That that's the negligence that he would get in terms of you didn't comply with everything, so you're out of a safe harbor. But the next is if you just simply negligent, but it's business judgment, then fine, but then you're only liable then in North Carolina law, he would say, when it's gross, because they're still entitled to their business judgment, which would be negligence. And for banking purposes, then you have to have gross negligence. It is kind of what he basically is understanding to say, why are you now liable without then exercising your business judgment negligence protection? First of all, because that's not the business judgment rule in North Carolina. That's a business judgment rule developed after enactment of the statute. And it's contrary to the statute, which says you do have to act in good faith and act with due care. And if you do those things, you shall not be liable. So it doesn't provide a robust business judgment rule that says, well, what you do then in your business judgment. But more importantly, I'd point the court to the Loudermilk and Scow decisions from the Georgia Supreme Court, because the Georgia Supreme Court was in a very similar situation. It had a lengthy common law that discussed a version of the business judgment rule. We're not going to question in hindsight the errors in judgment that are made, but it also provided for liability for ordinary negligence. And the court concluded that in light of the statute and the preexisting common law in Georgia, that directors and officers in that case of a bank, it was an FDIC case, had to exercise due care in the processes that they were using. And I think a way of looking at that is there isn't judgment in whether you've complied with legal lending limits. There's not judgment in whether you've violated your lending policies. There's not judgment in not monitoring your exceptions. But on the other hand, though, you equate negligence with you don't do what I say I want you to do. We don't, Your Honor. That's not exclusively what we do. We have an expert. We told them some things they need to do. They didn't do them. Therefore, they're negligent. Why is it not your argument? Because we said you haven't done what you have to do to exercise due care in giving a loan. You can't give a loan on unverified income. You can't give a loan based on an appraisal ordered by the loan originator, not even somebody in the bank in one case. And you shouldn't be giving loans. It's not prudent. It's not due care to give loans predicated on appraisals where the appraisals are ordered by the loan officers themselves. That warning was you need to have an independent appraisal function. And their answer was we will correct those flaws, recognizing that they are flaws that go to the process by which they're reaching the process underlying any judgment. So they're not exercising judgment when they don't have those processes. And I'd like to give some of the evidence that is hotly disputed. This is a head-to-head. We're not asking you to grant a summary judgment. But my friend discussed the real world. And his own expert, when asked, well, can bankers just ignore the warnings of the regulators, his answer was absolutely not. That would not be in their best interest. Acting against your best interest, acting against the bank's interest, is actually sufficient to show that you fall outside the business judgment rule at all, that you're in essence in bad faith. That's not necessarily the case. I don't think it's in your best interest ever to disagree with somebody from the government telling you you need to do something, whether you agree with it or not. You know, like Internal Revenue says something, I think they'll be prudent advice in. But not ignore that. But you may be wrong as two left shoes, but it's good advice not to ignore it. The expert witness. You're the regulator. You've got all the power. The expert witness that the FDIC provided. Don't you have all the power? You had the power to give the grade, didn't you? We had the power to give the grade, Your Honor. And you gave a grade, didn't you? We gave a grade predicated, a grade that included promises to make change and that was predicated on it being well within management's. Why did you note that then in your report? It is in the report, Your Honor. That this grade is predicated upon. I was paraphrasing, but as our brief indicates. I know it's sealed. I've got to direct. I don't want to get into anything that's sealed. But you're saying that you clearly said this grade is subject to complete defeasance if you don't do, about a property term, if you don't do what we say. You said that? That's not my position. My position is that if you're giving a 2 rating and the 2 rating explains that concerns are well within management's ability and willingness to change, that that is a part of the same record of examination, as are the commitments to change the flaws that were identified throughout the process. And this isn't a strict liability case for not changing. Rather, it's negligence in not changing and negligence in having the underlying flawed processes in the first place. As far as the real world goes, for 100 years, this bank survived the Great Depression, but it had accelerated its lending into commercial lending, a field that it was not experienced with, and ended up with what the expert described as a staggering concentration. That's at 2323. Judge Harris, you asked the question whether the expert affidavit didn't reflect that there were continued violations for each of the commercial loans. I don't have the particular page, but the expert affidavit said that there were a number of policies to protect the bank, and each of the commercial loans had at least three violations of those protections. And those were protections that they knew were necessary and committed to change in order to avoid risk that was attendant with their growing commercial real estate. And finally, the two rating in this case, the district judge did rely on it. The only other mention he made was to a statement in their consultant's report that substantial underwriting and documentation had been done. That same consultant's report also described flaws in their underwriting. What the district judge did here was drew only one inference from the two, ignored, cherry-picked, there's a two, that's good enough. I'll ignore page after page after page of warning, ignore statements the credit culture had changed, which it had not, and our evidence shows it had not. Statements that they were committed to making changes, and those weren't done. And so the district judge should not have cherry-picked, and it certainly is suitable to remand in order for this not to be, and you were right, the district judge said as a matter of law, the two takes away any dispute as to the facts. As a matter of law, it must be rational. And that isn't the case where they had demonstrated bad faith by not acting in the best interest of the bank, we contend, and where bad faith is a fact question for the jury. The Embry decision makes that clear in North Carolina. We're ignoring substantial warnings. They were on notice that you had flaws, and they failed to do those. What they asked for is a rule that a two in 2006 inoculates them from any corrections, that any corrections they might need to make, because a two was given. They can continue to do the wrong thing because a two had been given. That isn't the rule, and it's not what's reflected in the report of examination, certainly not takes into account none of the expert's evidence, which is based on the evidence that was developed during discovery. The expert's report is replete with footnotes referring to specific places where the evidence established the negligence and gross negligence of the defendants here. Mr. Watson? Yes, Your Honor. I want to ask you a question. Are you familiar with this corporate bank's articles of incorporation with respect to the exculpatory clause for the officer defendants? I mean the director defendants. Are you familiar with that? Yes, I am, Your Honor. Well, what does it say? It says that those directors cannot be held liable for simple negligence and breach of fiduciary duty. The exculpatory provision in the articles of incorporation for a cooperative bank did not let them escape liability for actions that were against the best interest of the bank. And it's our argument here that against the best interest of the bank is a fact question for the jury to make here, and the good faith is not strictly a matter of self-dealing. But if they ignored regulator warnings, ignored their own knowledge of flaws in the process, they were acting against the best interest of the bank and can't escape liability under that provision. Well, what did the exculpatory clause provide with respect to the director defendants? It provided that they would not be held liable, but it expressly eliminated any protections for actions that were against the interest of the bank. So it means nothing in your words? No, Your Honor. It doesn't mean nothing, but it means in this case where they did act against the best interest of the bank, it can't protect them, that they're not entitled to exculpation where they didn't act in the best interest of the bank. And in another circumstance where they acted in the best interest of the bank but simple negligence had occurred, they would be exculpated from that. As far as bank directors and officers, they can't be exculpated for conduct above gross negligence. Gross negligence, as the federal statute establishes, gross negligence is the floor. I'm not talking about gross negligence. I'm talking about ordinary negligence, the ordinary negligence claims slash breach of fiduciary claim. You don't think that clause would protect them from that? If we did not overcome, if we did not have evidence to establish that they did not act in the best interest of the bank and fell outside the protections of that exculpatory clause, it might go there. But in this case, we did provide that evidence. You're talking about evidence of gross negligence? Is that what you're talking about? Evidence of gross negligence and evidence of bad faith to which a juror is entitled to make that determination. My friend discussed sitting in the depositions, and he knew what those bank directors said. Well, the jury's never gotten that opportunity, and the evidence goes beyond ordinary negligence in this case. It goes to gross negligence, and we submit that it also goes to bad faith, and their only rejoinder to the bad faith issue is that bad faith in North Carolina requires self-dealing or a conflict of interest, and that's simply not the case. Thank you. We urge the Court to reverse. Thank you very much. Thank you very much. We will come down and greet counsel, and then proceed to our next case.
judges: Roger L. Gregory, Pamela A. Harris, Clyde H. Hamilton